Mr. Chief Justice TANEY.
In the cases of Thurlow v. The State of Massachusetts, of Fletcher v. The State of Rhode Island, and of Peirce et al. v. The State of New Hampshire, the judgments of the respective State courts are severally affirmed.-
The justices of this court do not, hQwever, altogether agree in the principles upon which these cases are decided, and I therefore proceed to state the grounds upon which I concur in affirming the judgments. The first two of these cases depend upon precisely the same principles ; and although the case against the State of.New Hampshire differs in some respects from the others, yet there are important -principles common to all of them, and on that account it is more convenient to consider them together. Each of the cases has arisen upon State laws, passed for the purpose of discouraging the use of ardent spirits within their respective territories, by prohibiting their sale in small quantities, and without licenses previously obtained' from the State .authorities. And the validity of each of them has been drawn in question, upon the ground that it is repugnant to that clause of the constitution of the United States which confers upon Congress the' power, to regulate commerce with foreign nations and among the several States.
The cases have been separately and fully and ably argued, and the questions which they involve are undoubtedly of the highest importance. But the construction of this clause in'the constitution has been so fully discussed at the bar, and in the opinions delivered by the court in former cases, that scarcely any-1 thing "can be suggested at this day calculated' to throw much additional light upon the subject, :or any argument-offered which has not heretofore been considered, and commented on, and which may not be found in the reports of the decisions of this court.
It is not my purpose to enter into a particular examination of the various passages in different opinions of the court, or of so,me of its members, in. former cases, which have been-referred to by counsel, and relied upon as supporting the construction of the constitution for which they are respectively contending. And I am, the less inclined to do so bécause I think these controversies often arise from looking to detached passages in the opinions, where general, expressions are sometimes-used, which, taken by themselves, are susceptible of a construction that- the court never intended should be given to them, and which in some instances would render different portions of the opinion inconsistent with each other. It is only by looking to the case under.consideration at the time, and taking the. whole opinion together, in_all its bearings, that we can correctly understand the judgment of the court.
The constitution of the United States declares that that .constitution, and the laws of the United States which shall be made in pur-- *574 stance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land. It follows that a law of Congress regulating commerce with foreign nations, or among the several States, is the supreme law ; and if the law of a State is in conflict with it, the law of Congress must prevail, and the State law cease to operate so far as it is repugnant to the law of the United States.
It is equally clear, that the power of Congress over this subject does not extend further .than the regulation of commerce with foreign nations and among the several States ; and that beyond these limits the States have never surrendered their power over trade and commerce, and may still exercise it, free from any controlling power on the .part of the general government. Every State, therefore, may regulate its own internal traffic, according to its own judgment and upon its own views of the interest and well-being of its citizens.
I am not aware that these principles lave ever been questioned. The difficulty has always arisen on their application'; and that difficulty is now presented in the Rhode Island and Massachusetts cases, where the question is how far a State may regulate or prohibit the sale of ardent spirits, the importation of which from foreign countries has been authorized by Congress. Is such a law a regulation of foreign commerce, or of the internal traffic of the State ?
It is unquestionably no easy task to mark by a certain and definite line the division between foreign and domestic commerce, and to fix the precise point, in relation to every imported article, where the paramount power of Congress terminates, and that of the State begins. The constitution' itself does not attempt to define these limits. They cannot be determined by the laws of Congress or the States, as neither can by its own legislation enlarge its own powers, or restrict those of the other. And as the constitution itself does not draw the line, the question is necessarily one for judicial decision, and depending altogether upon the words of the constitution.
This question came directly before the court for the first time in the case of Brown v. The State of Maryland, lá'Wheat. 419. And the court there held that an article authorized by a law of Congress to be imported continued- to be a part of the foreign -commerce of the country while it remained in the hands of the importer for sale, in the original bale,- package, or vessel in which it was imported ; that the authority given to import necessarily carried with it the right to' sell the imported article in the form and shape in which it was imported, and that no State, either by direct assessment or by requiring a license from the importer before he was permitted to sell, could impose any burden upon him or the property imported beyond what the law of Congress had itself imposed ; but that when the original package was broken up for use or for retail by the im *575 porter, and also when the commodity-had passed from bis hands, into the hands of a purchaser, it ceased to be an import, or a. part of foreign commerce, and became subject to the laws of the State,- and might be taxed for State purposes, and the sale regulated by the State, like any other property. This I understand to ,be substantially the decision in the case of Brown v. The State of Maryland, drawing the line between foreign commerce, which is subject to the regulation of Congress, and internal or domestic ■ commerce, which belongs to the States, and over which Congress can exercise no control.
I argued the case in behalf of the State, and endeavoured to maintain that the law of Maryland, which required the importer as well as other dealers to take out a license before he could sell, and for. which he was to pay a certain sum to the State, was valid and constitutional; and certainly I at that time persuaded myself that I was right, and thought the decision .of the court restricted the powers of the State more than a sound construction of the consti-. tution of the United States would warrant. - But further and more mature reflection-has convinced me that the rule laid down by the Supreme Court is a just and safe one, and perhaps.the best that could have been adopted for preserving the right of the United' States on the one hand, and of the States on the other, and preventing collision between-them. The question^ I have already said, was a very difficult one for the judicial mind. In the. -nature of' things, the line of division is in some degree vague and indefinite, and I do- not see hovv it could be drawn more accurately and correctly,. or more in harmony with the • obvious intention and object of this provision in the constitution. Indeed, goods imported, while they remain in the hands of the importer, in thé form and sh^pe in which they were brought into the country, can in no just-sense be' regarded as a part of that mass of property in the State-usually-taxed for the support of the State government. The immense, amount of foreign products used and consumed in this country are imported, landed, and offered for sale in a' few commercial cities, and a very small portion of them are intended or expected to be used in the State in which they are imported. A great (perhaps the greater) part imported, in some of the cities, is not owned or brought in by citizens of the State, but by citizens of other States, or foreigners. And while they are in the hands of the importer for sale, in the -form- and shape in which they were introduced, and in which they are intended to be sold, they may be regarded as merely in transitu, and on their way to the distant cities, villages, and country for which they are destined, and where they are expected to be used and consumed, and for the supply of which they were in truth imported. And a tax upon them while in this condition, for State purposes, whether by direct assessment, or indirectly, by requiring a license to sell, would be. hardly more justifiable in prin *576 ciple than a transit duty upon the merchandise when passing through a State. A tax in any shape upon imports is a- tax on the consumer, by enhancing the price of the commodity! And if a State is permitted to levy it in any form, it will put it in the- power of- a maritime importing State to raise a revenue for the support of its own government from citizens of other States! as certainly and effectually as if the tax was laid openly and without disguise as a duty on imports. Such a power in a State would defeat one of the principal objects of forming and adopting the constitution. It cannot be done directly, in the shape of a duty on imports, for that is expressly prohibited. And as it cannot -.be done directly, it could hardly'be a just and sound construction of the constitution which would enable a State to accomplish precisely the same thing under another name, and in a different form.
Undoubtedly a State may impose a tax upon' its citizens in proportion to the amount they are respectively worth; and the importing merchant is liable to this assessment like any other citizen; and is chargeable according to the amount of his property, whether it consists of money engaged in trade, or of imported goods which he proposes to sell, or any other property of which he is the o wner. .But a tax of this description stands upon a very different footing from a tax on.the thing imported, while it remains a part of foreign commerce, and. is not introduced into the general mass of property in the State. Nor, indeed, can it even influence materially the price of the commodity to the consumer, since foreigners, ás well as citizens of other States, who are not chargeable with the tax, may import goods into the same place and offer them for sale in the same market, and with whom the resident, merchant necessarily enters into competition.
Adopting, therefore, the rule as laid down in Brown v. The State of Maryland, I proceed to. apply it to the cases of Massachusetts and Rhode Islánd. The laws of Congress regulating foreign commerce- authorize the importation of spirits, distilled liquors, and brandy, in casks 6r vessels not containing less than a certain quantity, specified in the laws upon this subject. Now, if the State laws in question came in collision with those acts of Congress, and .prevented or obstructed the importation or sale of these articles by the importer in the original cask or vessel in which they were imported, it would be the duty of this court to declare them void.
It has, indeed, been suggested, that, if a State déems the traffic in ardent spirits to be injurious to its citizens, and calculated to ■introduce immorality, vice, and pauperism, into the State, it may constitutionally refuse to permit its importation, notwithstanding the laws of Congress ; and that a State may do this upon the same principles that'it may resist and prevent the introduction of disease, pestilence, or pauperism from abroad. But it must be.remembered that disease, pestilence, and pauperism are not' subjects of com- *577 meree, although sometimes among its attendant evils. They are not things to be regulated and trafficked ‘in, but to he prevented, as far as human foresight or hupian means can guard against them. But spirits and distilled liquors are universally admitted to be subjects of ownership and property, and are therefore, subjects of exchange, barter, and traffic, like any other commodity in which a right of property exists. And Congress, under .its general power to regulate commerce with foreign nations, may prescribe what article of merchandise shall be admitted,. and what excluded; and may therefore admit, or not, as it, shall deem best, the importation of ardent spirits. And inasmuch as the laws of Congress authorize their importation, no State has a right to prohibit their introduction.
But. I do not understand the law of Massachusetts .or Rhode Island as interfering with the trade in ardent spirits while the article remains a part of foreign commerce, and is in the hands, of the importer for sale, in the cask or .vessel in which the laws of Congress authorize it to be imported.. These State laws act altogether upon the retail or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce, and become a part of the general mass of property in the State. These laws mayj indeed, discourage imports, and diminish the price which ardent spirits would otherwise bring. But although a State is bound to receive and to permit the sale by the importer of any article of merchandise which Congress authorizes to be imported, it. is not bound to furnish a market for it, nor to abstain .from the passage of any law which it may deem, necessary or advisable to guard the health or morals of its citizens, although such law may discourage importation, or diminish the profits of the importer, or lessen the revenue of the general government. And if any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated, to produce idleness, vice, or debauchery, I see nothing in the constitution of the United States to prevent it .from regulating and restraining the traffic, -or from prohibiting it altogether, if it thinks proper.-. Of 'the wisdom of this policy, it is'not my province or my purpose to speak. Upon that subject, each State must decide for itself. I speak only of'the restrictions which the constitution and laws of the United States have imposed- upon the States. And as these laws of Massachusetts and Rhode Island are not repugnant to the constitution of the United States, and do not come in conflict with any law of Congress passed in pursuance of its authority to regulate commerce with foreign nations and among the several States, there is no ground upon which this court can declare them to be void.
I come now to the New Hampshire case, in which a different principle is involved, — the question, however, arising under the same clause in the constitution, and depending on its construction.
The law .of New Hampshire prohibits the sale of distilled spirits, *578 in any quantity, without a license from the selectmen of the town in which the party resides. The plaintiffs in error, who were merchants in Dover,- in New Hampshire, purchased a barrel of gin in Boston, brought it to Dover, and sold it in the cask in which it was.imported, without a-license from the selectmen of the town.. For this sale they were indicted, convicted, and fined, under the law above mentioned.
The power to regulate ..commerce among the several States is granted to Congress in the same clause, and by the. same words, as the power to regulate commerce with foreign nations, and is coextensive with it. And, according to the doctrine in Brown v. Maryland, the article, in question, at, the time of. the sale, was subject to the- legislation of Congress.
The present casé, however, differs' from Brown v. The State of Maryland in this, —that the former was one arising out of commerce With foreign- nations, which- Congress had regulated by law; whereas the present is a case of commerce between two States, in relation to .which Congress has not exercised its ptiwer. Some acts' of Congress have indeed been'referred to in relation to the coasting trade. . But they are evidently intended merely to prevent smuggling, and .do not regulate imports or exports from one''-State to another. ■ This case differs also from the cases of Massachusetts and Rhode Island; because, in these two cases, the laws of the States, operated upon the articles after they had passed beyond .the limits of foreign' commerce, and. consequently were beyond the control and power of Congress. But the law of New Hampshire acts directly upon-an import from one State to another, while in the hands of- the importer for sale, and' is therefore a regulation of commerce, acting upon the article while it is within the admitted jurisdiction of the general government, and subject to its control and regulation.
The question, therefore, brought up for decision is, whether a State is prohibited by the" constitution of the United States from making any regulations of foreign commerce, or of commerce with, another State, although such regulation is confined to its own territory, and made for its own convenience or interest, and does not come in. conflict with any law of Congress. In other words, whether the' grant of power to. Congress is of itself a prohibition to the States, and renders all State laws upon the subject null and void. This is the question upon which the case turns ; and I do not-see how it can be decided upon any other ground, provided.we adopt the line of division between foreign and domestic commerce as marked out by the court in Brown v. The State of Maryland. I proceed, therefore, to state my opinion upon it.
It is well known that upon Jthis subject a difference of opinion has existed, and still exists, among the members of this court. But with every , respect for the opinion of my brethren with whom I *579 do not agree, it appears to me to be very clear, that the mere grant of power to the general government cannot, upon any just principles of construction, be construed to be an absolute prohibition to the exercise of any power over the same subject by the States. The controlling and supreme power over commerce with foreign nations and the several States is undoubtedly conferred upon Congress. Yet, in my judgment, the Stale may nevertheless, for the safety or convenience of trade, or for the protection of the' health of its citizens, make regulations, of commerce for its own ports and har-bours, and for its own territory; and such regulations are valid unless they come in conflict with a law of Congress. Such evidently 1 think was the construction which the constitution universally received at the time of its adoption, as appears from the legislation of Congress and of the several States ; and a careful examination of the decisions of this court will show, that, so far from sanctioning the opposite doctrine, they recognize and maintain the power of the States.
The language in which the grant of power to the general government is made certainly furnishes no warrant for a different construction, and there is no prohibition to the States. Neither can it be inferred by comparing the provision upon this subject, with those that relate to other powers granted by the constitution to the general government. On the contrary, in many instances, after the grant is made, the constitution proceeds to prohibit the exercise of the same power by the States in express terms ; in soine cases absolutely, in others without the consent of Congress. ’ And if it was intended to forbid the States from making any regulations of commerce, it is difficult to account for the omission to prohibit it, when that prohibition has been so carefully and-distinctly inserted in relation to other powers, where 'the action of the State over the same subject was intended to be entirely excluded. ■ But if, as I think, the framers of the constitution (knowing that a multitude of minor regulations must be necessary, which Congress amid its great concerns could never find time to consider and provide) intended merely to' make the power of the federal government supreme upon this subject over that of the States, then the omission of any prohibition is accounted for, and is consistent with the whole instrument. The supremacy of the laws of Congress, in cases of collision with State laws, is secured in the article which declares that the laws of Congress', passed in pursuance of the powers granted, shall be the supreme law ; and it is only where both governments may legislate on the same subject that this article can operate. For if the mere grant of power to the general government was in itself a prohibition to the States, there, would seem to be no necessity for providing for the supremacy of the laws of Congress, as all State laws upon the subject would be ipso Jacto, void, aircFthere could therefore be. no such thing as conflicting laws, nor any question *580 about the supremacy of conflicting legislation. It is only where both may legislate on the subject, that the question can arise.
■ I have said that the legislation of Congress and the States has conformed tó this construction from the foundation of the government. . This is sufficiently exemplified in the laws in relation to pilots and pilotage, and the health and quarantine' laws..
In relation to the first, they are admitted on all hands to belong to foreign commerce, and to be subject to the regulations of. Congress, under the grant of power of which we are speaking. Yet they have been continually regulated by-the,maritime States, as fully and entirely since the adoption of the constitution as they were before ; and there is but one law of Congress making any specific regulation upon the subject, and that passed as late as 1837, and intended, as it is understood, to alter only a single provision.-of the New York law, leaving the residue of its provisions entirely untouched. It is true, that the act of 1789 provides that pilots shall continue to be regulated by the laws of the respective States then in force, or which' may thereafter be' passed, until Congress shall make provision on the subject. And undoubtedly Congress had the power, by assenting to the State laws then • in force, tó make them its own, and thus make the previous regulations of the States the regulations of the general government. But it is equally' clear, that, as to all future laws by the States, if the constitution deprived them of the power of making .ahy regulations on the subject, an act of Congress could.not restore it. For it will hardly be contended that an act-of Congress can alter the constitution, arid confer upon a State a power which the constitution declares it shall not possess. And if the grant of power to the United States to make regulations of commerce is a prohibition to the States to make, any regulation upon the subject, Congress could .no more -restore to the States the power of which it was thus ■ deprived, than it could authorize them to coin money, or make paper-money a tender in the payment of debts, or to do any other act forbidden to them by the constitution. Every pilot law in the comrriercial States has, it-is believed, been either modified or passed since the act of 1789 adopted-those then in force ; and the provisions since made are all void, if the restriction on the power of. the States now'contended. for should bé maintained ; and. the regulations made,-the duties imposed, the securities required, and penalties inflicted by these various Slate laws are mere nullities, and could not be enforced in a court of justice. It is hardly necessary to speak of the mischiefs which such a construction would produce to those who are engaged in shipping, nayigation, and -commerce. ■ Up to this time their validity has never been questioned. On the contrary, they have been repeatedly recognized and upheld by the decisions of this court; and it will be difficult to show -how this can be done, except upon the construction of the constitution which I am now maintaining: *581 So, also, in regard to health and quarantine laws. They have been continually passed by the States ever since the adoption of the constitution, and the power to pass them recognized by acts .of Congress, and the revenue officers of the general government directed to assist.in their execution. Yet all of these health and quarantine laws are necessarily, in some degree, regulations of foreign commerce in the ports- and harbours of the State. They subject the ship, and cargo, and crqw to the inspection of a health-officer appointed by the State ; they prevent the crew and cargo from landing until the inspection is made, and destroy the cargo if deemed dangerous to health. And during all this time the vessel is detained at the place selected for the quarantine ground, by the State authority. The expenses of these precautionary measures are also usually, and I believe universally, charged upon the master, the owner, or the ship, and the amount regulated by the State law, , and not by Congress!- Now, so far as these-laws interfere with shipping, navigation, or foreign commerce, or impose burdens upon either of them, they are unquestionably regulations of commerce. Yet, as I have already said, the power has been continually exercised by the States, has been continually recognized by Congress ever since the adoption of the constitution, and constantly affirmed and supported by this court whenever the subject came before it.
The decisions of this court will also, in my opinion, when carefully examined., be found to sanction the construction I am maintaining. It is not my purpose to refer to all of the cases in which this question has been spoken of, but only to the principal and leading ones; and, —
First, to Gibbons v. Ogden, because this is the case usually referred to and relied on to prove the exclusive ppwer of Congress and the prohibition to the States. It is true that one or two passages in that opinion, taken by themselves, and detached from the context, w'ould seem to countenance this doctrine. And, indeed, •it has always appeared to me that this controversy has mainly arisen out of that case, and that this doctrine of the exclusive power of Congress, in the sense in which it is now contended for, is comparatively a modern one, and was never seriously put forward in any case until .after the decision of Gibbons v. Ogden, although it has been abundantly discussed since. Still, it seems to me to be clear, upon a careful examination of that case, that the expressions referred to do not warrant the inference drawn from them, arid were not used in the sense imputed to them ; and that the opinion in'that case, when taken altogether and with reference to the subject-matter before the court, establishes the doctrine that- a State may, in the execution of its powers of internal police, make regulations of foreign commerce; and that rsuch regulations are valid, unless they come, into collision with a law of Congress, Upon examining that opinion, it will be seen that the court, when it uses the expressions' *582 which are supposed to countenance the doctrine of exclusive power in Congress, is commenting upon the argument of counsel in favor of equal powers on this subject in the States and the general government, where neither party is bound to yield to the other ; and is drawing the distinction between cases of concurrent powers and those in which the supreme or paramount power was granted to Congress. It therefore very justly speaks of the States as exercising their own' powers in laying taxes for State purposes, although the same thing is taxed by Congress ; and as exercising the ■powers granted to Congress when they make regulations of commerce. In the first case^ the State power is concurrent with that of the general government, — is equal to it, and is not bound to yield. In the second, it is subordinate and subject to the superior and controlling power conferred upon Congress. And it is solely with reference to this distinction, and in the midst of this argument upon it, that the court uses the expressions which are supposed to maintain an absolute prohibition to the States. But it certainly did not mean to press the doctrine to that extent.. For it does not decide the case on that ground (although it would have been abundantly .sufficient, if the court had entertained the opinion imputed to it), but, after disposing of the argument which had been offered in favor of concurrent powers, it proceeds immediatelyj in a very full and elaborate argument, to show that there was a conflict between die law of New York and the act of Congress, and explicitly puts its decision upon that ground. Now the whole of this part of the opinion would have been unnecessary and out of place, if the State law was of itself a violation of the constitution of the United States, and therefore utterly null and void, whether it did or did not come in conflict with the law of Congress.
Moreover, the court distinctly admits, on pages 20.5, 206, that a •State may, in the execution of its police and health laws, make regulations of commerce, but which Congress may control. It is very clear, that, so far as these regulátions are merely internal, and do not operate on foreign commerce, or commerce among the States, they are altogether independent of the power of the general government and .cannot be controlled by it. The power of control, therefore, which the court speaks of, presupposes that they are regulations of foreign commerce, or commerce among the States. And if a State, with a view to its police or health, may make valid regulations of commerce which yet fall within the controlling power of the general government, it follows that the State is not absolutely prohibited from making regulations of foreign commerce within its own territorial limits,'provided they do not come in conflict with the laws of Congress.
It has been said, indeed, that quarantine and health laws are passed by the States,.not by virtue of a power to regulate commerce, büt by virtue of their police powers, and in order to guard *583 the lives and health of their citizens. This, however, caimot.be said of the pilot laws, which are yet admitted to be equally valid. But what are the police powers of a State ? They are nothing more or less than the. powers of government inherent in every sovereignty to the extent of its dcSñiiiions. And whether a'State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own'limits, in every case it exercises the same power ; that is to say, the power of sovereignty, the power to govern men and things within the limits- of its dominion. It is by virtue of this power that it legislates ; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United 'States. -And when the validity, of a State law making regulations of commerce is drawn into question ip a. judicial tribunal, the authority to pass it cannot be made to depend upon the motives that may be supposed to have influenced the legislature, nor can the court inquire whether it was intended to guard the. citizens of the State from pestilence and disease, or to make regulations of commerce for the interests and cónveniénce of trade.
Upon this question the object and motive of the State are of no importance, and cannot influence the decision. It is a question of power. -Are the States absolutely prohibited by the constitution from making any regulations of foreign commerce ? If they are, then such regulations are null and void, whatever may have been the motive of the State "w whatever the real, object of the law; and it requires no law of Congress to control or annul them. Yet the case of Gibbons v. Ogden unquestionably afiirms that such regulations may be made by a State, subject to the controlling power of Congress. And if this may be done, it necessarily follows that the grant of powewto the federal government is not an absolute and entire prohibition to the States, but merely confers upon Congress the superior and controlling power. And to expound the particular passages herein before mentioned in the manner insisted upon 'by those who contend for the prohibition.would be to make different parts of that opinion inconsistent with each other, — an error which I am quite sure-no one will ever impute to the very eminent jurist by.whom the opinion was-delivered.
And that the meaning bf the court in the case of Gibbons v. Ogden was such as I have insisted on is, I think, conclusively proved by the case of Willson et al. v. The Blackbird Creek Marsh Company, 2 Peters, 251, 252. In that case a dam authorized by a State law had been erected- across a navigable -creek, so as to obstruct the commerce above it. And the validity of the State law was objected to, on the ground that it was repugnant'to the constitution of the United States, being a regulation of commerce. But the court says, — “ The repugnancy of thd law of Delaware to the *584 constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, and among the several States ; a power which has not been so exercised as to affect the question ” , and then proceeds to decide that the law of Delaware could not be considered as repugnant to the power to regulate commerce in its dormant State, or as being in conflict with any law passed on the subject.” ?
• The .passages I have quoted show that the validity of the State law was maintained because it was not in conflict with a law of Congress, although it was confessedly within the limits of the power granted. .And it is-worthy of remark, that the counsel for the plaintiff in error in that case relied upon Gibbons v. Ogden as conclusive authority to show the unconstitutionality of the State law, no doubt placing upon the passages Í have mentioned the construction given to them by those who 'insist upon the exclusiveness of the power. This case, therefore, was brought fully to the attention of the court. And the decision in the last case, and the grounds on which it was placed, in my judgment show most clearly what was intended in Gibbons v. Ogden ; and that in that case, as well as in the case of Willson v. The Blackbird Creek Marsh Company, the court held that- a State law was not invalid merely because it made regulations of commerce, but that" its invalidity depended upon its repugnancy to a law of Congress passed hr pursuance of the power granted. And it is worthy, also, of remark, that the opinion in both of these cases was delivered by Chief Justice Marshall; and I consider his opinion in the latter one as an exposition of what he meant to decide in the former.
In the case of the City of New York v. Miln, 11 Peters, 130, the question as to the power of the States upon this subject.whs very fully discussed at the bar. But ’no opinion was expressed upon it ,by the court, because the case did not necessarily involve it, and there’ was great diversity of opinion on the bench. Consequently the point was left open, and has never been decided in'any subsequent case in this court.
For my own part, I have always regarded the eases of Gibbons v. Ogden, and Willson v. The Blackbird Creek Marsh Company, as abundantly sufficient to sanetion the qonstruction of the constitution which ill my judgment'is the true one. Their correctness has never been questioned ; and I forbear, therefore, to. remark on the other cases in which this subject has been .mentioned and discussed.
It may be well, however, to remark, that in analogous cases', where,.by the constitution of the United States, power over a particular subject is conferred on Congress without any prohibition to the States, the same rule of construction has prevailed. Thus, in the case of Houston v. Moore, 5 Wheat. 1, it was held, that the grant of power to the federal government to provide for organizing, arming, and disciplining the militia did not preclude the States from *585 legislating on the same subject, provided the law of the State was not repugnant to the law of Congress. And every State in the Union has continually legislated on the subject, and I am not aware that the validity of these laws has ever been disputed, unless they came in .conflict with the law of Congress.
The same doctrine was held in the case of Sturges v. Crowninshield, 4 Wheat. 196, under the clause in the constitution which gives to Congress the power to establish uniform laws on.the subject of bankruptcies throughout the United' States.
And in the case of Chirac v. Chirac, 2 Wheat. 269, which arose under the grant of power to. establish a uniform rule of naturalization, where the court speak of the power of Congress as exclusive, they are evidently merely sanctioning the argument of counsel stated in the preceding sentence, which placed the invalidity of the naturalization under the law of Maryland, not solely upon the grant of power in the constitution, but insisted that the Maryland law was “ virtually repealed by the constitution of the United States, and the act of naturalization enacted by Congress.” Undoubtedly it was so repealed, and the opposing counsél in the case did not dispute it. For the law of the United States covered every part of the Union, and there could not, therefore, by possibility be a State law which did not come in conflict with it. And, indeed, in this, case it might well have been doubted whether the grant in the constitution itself did not abrogate the power of the States, inas.much as thé constitution also provided, that the citizens of eabh State should be entitled to all the privileges and immunities of citizens in the several States ; and it would seem to be hardly consistent with this provision to allow any pne State, after the adoption of the constitution, to exercise a power, which, if it operated at all, must operate beyond the territory of the State, and compel other States to acknowledge as citizens those whom it might not be willing to receivé.
In referring to the opinions of those who sat here before usj it is but justice to them, in expounding their language, to keep in mind the character of the case they weré deciding. And this is more especially necessary in cases depending upon the construction of the constitution of the United States ; where, from the great public interests which must always be involved in such questions,'this court have usually deemed it1 advisable to state very much at large the ■principles and reasoning upon which their judgment was founded, and to refer to and cominent on the leading points made by the counsel on either side in the argument. And I am not aware of any instance in which the court have spoken of the grant of power to the general government as excluding all State power over the subject, unless they were deciding a case where the power had been exercised by Congress, and a State law came in conflict with it. In cases of this kind, the power of Congress undoubtedly excludes *586 and displaces that of the State; because, wherever there is collision- between them, the law of Congress is supreme. And it is in this sense only, in my judgment, that it has been spoken of as exclusive in the opinions of the court to which' I ’have referred. The cáse last mentioned is a striking example ; for there the language of the court, affirming in the broadest terms the exclusiveness of the power, evidently refers to the argument of counsel stated in the preceding sentence.
Upon the whole, therefore, the law of New Hampshire is,'in my judgment, a. valid one. Fof, although the . gin sold was an import from another Státe, and Congress have clearly the power to regulate such importations, under the grant.of power to regulate commerce among the several States, , yet, as Congress'has made no regulation on'the subject, the traffic in the article may be lawfully regulated by the Staté as soon as it is landed in its territory, and a tax imposed upon it, or a license required, or the sale áltbgether prohibited, according to the policy which the State may suppose to be its 'interest or duty to pursue.
The judgment of the State courts ought, therefore, in my opinion, to be affirmed in each of the three cases before us.
Mr. Justice McLEAN.
Thurlow v. The Commonwealth of Massachusetts.— Error from the State Court.
The plaintiff was indicted 'and. convicted under the Revised Statutes of. Massachusetts, chapter 47, and the act of 1837, chapter 242, for selling foreign spirits, in 1841 and 1842, without a license.
The third section of the revised act provides that no person shall presume to be. a retailer Of seller of wine, brandy, rum, or other spirituous liquors, in a less quantity than twenty-eight gallons, and that delivered and carried away all ■ at one time, unless he is first licensed as a retailer of wine and spirits, u under the penalty of twenty dollars.” The seventeenth section authorizes the county commissioners to 'grant licenses ; and the second section of the act ■.of 1837 provides, that nothing contained in that act,’or in the forty-séventh chapter of the Revised Statutes, shall be so construed as to require the county commissioners to grant any licenses, whep in their opinion the public good does not require them to be granted.”
. On the trial in the Court of Common Pleas it was objected that a part of the .spirits sold were foreign ; but the court instructed the jury that such sale was in violation of the statute, which was not inconsistent with the constitution of revenue laws of the United States. On this ruling' of .the court an; exception was taken, and the cause was removed to the Supreme Court of the State of Massachusetts, which overruled the exception, and entered a judgment on the verdict against the defendant.
*587 The acts of Congress authorize the importation of spirits in casks of fifteen gallons, and wine in bottles.
The great question in this case is, whether the license laws of Massachusetts are repugnant to the constitution of the United States, or the revenue laws which have been enacted under it.
And,-first, it is insisted that they are unconstitutional, as they prohibit the importer from selling an article that he is authorized to import, without the payment of an additional duty, or impost, which the. State cannot-impose.
The case of Brown v. The State of Maryland, 12 Wheat. 419, is supposed to be conclusive upon this point. This may be'admitted, and yet it does not rule the’ case before us.
Brown was charged with having imported and sold a package of dry goods without a license. An act of Maryland required all importers, before the sale of.their imported articles, to take out a license. And the court held, “ that a tax on the sale of an article, imported only for sale, is a tax on- the article itself” ; — “ that the importation» gave a right to the importer to sell the package in question free from any charge by the State, and consequently that the act of Maryland was unconstitutional and void, as being repugnant to that article of the constitution which declares, that no' State shall lay an impost or duties on imports or exports.” -
The act was also held to be repugnant to that clause in the constitution which “ empowers Congress . to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.”
In Brown’s case the reasoning of the court and their decision turned upon the fact, that he,, being the importer pf the package, had a right to sell it; that this right continued so long as the package was unbroken, and remained the property of the importer..
The plaintiff, Thurlow, asserts no right, as an- importer of the article sold. He purchased it in the home market; consequently neither the general reasoning nor the ruling of the court in Brown’s, case can control this one.
.The tenth amendment of the constitution declares, that “the powers not delegated to the United States by the constitution, nor prohibited by it to the States,- are reserved to the States respectively, or to the people.”
Before the adoption of the constitution, the States possessed, respectively, all thé attributes of sovereignty. In their organic laws they had distributed their powers of government accofding to their own views, subject to such modifications as the people of each State' might sanction. The agencies established by the articles of confederation were not entitled to the dignified appellation of government
Among the delegated functions it is declared, that “Congress shall have power to regulate commerce with foreign nations, and *588 among the several States, and with the Indian tribes.” This, investiture of power is declared by this court, in the case of Gibbons v. Ogden, 9 Wheat. 1, and also in Brown v. The State of Maryland, “ to be complete'in itself, and to acknowledge no limitations other than are prescribed by the constitution.”
There may be a limitation on the exercise of sovereign powers, but that State, is not sovereign which is subject to the will of another. This remark applies equally to the federal and State governments. The federal government is supreme within the scope of its delegated powers, and the State governments are equally supreme in the exercise of those powers not delegated by them nor inhibited to them. From this it is clear, that while these supreme functions are exercised by the federal and State governments, within their respective limitations, they can never come in conflict. And when a conflict occurs, the inquiry must necessarily -be, which is the paramount law ? And that must depend upon the supremacy of the powet by which it was enacted. The federal government is supreme in the exercise of powers delegated to it, but beyond this its acts are unconstitutional and void'. So the acts of the States. are void when they do that which is inhibited to ,them, or exercise a power which they have exclusively delegated to the federal government.
The power to tax is common to the federal and State governments, and it may be exercised by each in taxing the, same property ; but this produces no conflict of jurisdiction. The conflicts' which have arisen are mainly attributable to the want of an accurate definition and a clear comprehension of the respective powers of the two governments. ' In a system of government so complex as ours, it, may be difficult,, perhaps impracticable, to prescribe the exact limit, in particular cases, to federal and State.powers.
The powers expressly prohibited to the States are few in number, and,are specified in the constitution. .Those which are exclusively delegated to the federal government, and consequently, by implication, áre prohibited'to the States, are more numerous.
The' States, resting upon their original basis, of sovereignty, •subject only to the exceptions' stated, exercise their powers over every thing connected with their social' and internal condition. A State' regulates its domestic commerce, contracts, the transmission of estates, real and personal, and acts upon all internal matters which relate to its moral' and political welfare. Over these subjects the .federal government has no power. They appertain to the State .sovereignly as- exclusively as powers exclusively delegated appertain to the general government.
The license acts of Massachusetts do not purport to be a regulation of commerce. They are essentially police laws. 'Enactments similar in principle are common to all the States. Since the adoption of its constitution they have existed in Massachusetts. A great *589 moral reform, which enlisted the judgments and excited the sympathies of the public, has given notoriety to this course of legislation, and extended it, lately, beyond its former limit. And the question is now raised, whether the laws under consideration trench upon the power of Congress to regulate foreign commerce.
These laws do not in terms prohibit the -sale of foreign spirits, but they require a license to sell any quantity less than twenty-eight gallons. Under the decision of Brown v. Maryland, it is admitted that the license acts cannot operate upon the right of the importer to sell. But, after the import shall have passed out of the hands of the importer, whether it remain in the original package or cask, or be broken up, it becomes mingled with other property in the State, and is subject to its laws. This is the predicament of the spirits in question.
A license* to sell an article, foreign or domestic, as a merchant, or innkeeper or victualler, is a matter of police and' of revenue, within the power of a State. It is strictly an internal regulation, and cannot come in conflict, saving the rights of the importer to sell, of any power possessed by Congress. It is said tp reduce the amount of importation, by lessening the profits of the thing imported. The license is a charge upon the business, or profession, and not a duty upon the things sold. . The same price is charged to evéry retailer of merchandise', or spirits, at the same place, without regard to the amount.sold. This charge is in advance of any sales. It would be difficult to show that Such a regulation reduced the amount of imported goods. But, if this were the effect of the license, would that make the acts unconstitutional ?
The acknowledged police power of a State-extends often- to the destruction, of property. A nuisance may be abated. Every thing prejudicial to the health or morals of a city may be removed. Merchandise from a port where a contagious disease prevails, being liable to communicate the disease,, may be excluded ; and, in extreme cases, it may be thrown into the sea. This comes in direct conflict with the regulation of commerce ; and yet no one doubts the local power. It is a power essential to self-preservation, and exists, necessarily,- in every organized community. It is, indeed, the.law of nature, and is possessed by man in his individual capacity. He may resist that which does him harm, whether he be assailed- by an assassin, or approached by poison. And it is the settled construction of every regulation of commerce, that, under the sanction of its general laws, no person can introduce into a community malignant diseases, or any thing which contaminates its morals, or endangers its safety. And this is an acknowledged-principle applicable to all general regulations. Individuals in the enjoyment of their own rights must be careful not to itijure the rights of others.
From the explosive nature of-gunpowder, a city may exclude it. Now this is an' article of commerce, and is not known to carry in- *590 factious disease ; yet, to guard against' a contingent injury, a city may prohibit its introduction. These exceptions are always implied in commercial regulations, where the general government is admitted to have the exclusive power. They aré not regulations of commerce, but acts of self-preservation. And although they affect commerce to some extent, yet such effect is the result. of the exercise of an undoubted power in the State.
The objection is strongly and confidently urged, that a license may be refused under these laws, which would, in effect, prevent importation, as importation is'omy made to sell.
It is admitted that a State law which shall prohibit importations of foreign spirits, being repugnant to the commercial power in the federal government, and contrary to the act of Congress on that subject, would be void. The object of such a law would,-upon its face, be a regulation of commerce, which is not within the powers of a. State. But a State has a right to regulate the sale of this, as of every other imported article, out of the hands of the importer
Thé license system, as adopted in all the States, restrains pety pons from selling by retail, who have not taken a license ; and a license to retail spirits is granted by the c ourt, or some othér body,, at its discretion, and on certain conditions. This is the character of the law under consideration. The applicant .to obtain a license must be recommended by a majority of the selectmen of the town, ás a person of good moral character. Should this recommendation be refused improperly or unjustly, an appeal is given to the com-, missioners of the county. But the commissioners are not required to grant any licenses, “ when, in their opinion, the public good does not require them to be granted.”
There is no evidence in the record of a refusal to grant a license in this case. The plaintiff is charged with selling without.a license ; but it nowhere appears that be ever applied for one. This would seem, tó be conclusive. For if a State have a right to regulate the retail ef foreign spirits, no one can retail them where a lic.-mse is required without it, Now, that, a State may do this no one doubts. And it is equally clear, if the plaintiff rests upon a prohibition to sell, it must be shown-. This does not appear on the face of the law, and if, in the exercise of their discretion, the commissioners have refused all licenses, that is a matter of fact which must be established. On this ground alone, admitting the force of the arguments for the plaintiff, his case must fail.
But, not to rest, the decision of so important a question on a dev feet of1 proof, we will consider the case as if the fact of refusal to grant the license were in the record.
The necessity of a license presupposes a prohibition of the right to sell as to those who have no license. For if a State may require a license to sell, it may, in the exercise of a proper discretion, limit the number of such licenses as the public good may seem to require. *591 This is believed to have been done under every system of licenses to retail spirits which has been adopted in the different States. And this limitation may, possibly, lessen the'sale of ihe article. This may be the result of any regulation on the subject. But it constitutes no objection to the law. An innkeeper is forbidden to allow drunkenness in his house, and if this prohibition be observed, a less quantity of rum is sold.' Is this unconstitutional, because it may reduce the importation of the article ? Such an argument would be so absurd as to be át once rejected by every sound mind. No one could fail to see that the injunction was laid for the maintenance of good order and good morals. To reject this view would make-the excess of the drunkard a constitutional duty, to encourage the importation of ardent spirits.. -
Such an argument would be, advanced by no one, and. no one would question either the constitutionality Or expediency of the law-which prohibits an innkeeper from encouraging drunkenness. And yet in this simple proposition's the argument answered against the constitutionality of the laws in question.
A discretion on this subject must be exercised somewhere, and it can be exercised nowhere but under the State authority. The State may regulate the sale of-fpreign spirits, and such regulation.is valid, though it reduce the quantity of spirits-consumed. - This -is admitted^ And how can this discretion be controlled. The powers of the general government do not extend to it.; It is in every aspect a local regulation, and relates 'exclusively to the internal police of the State.,
It is said that the object of these Jaws is to prohibit the importation of foreign spirits. This is an inference which their language does not authorize. A license is only required to sell, in less:quantity than twenty-eight gallons. A greater quantity than this may be sold without restriction. But. -it is said, if the legislature may require a license for twenty-eight gallons, it may extend the limitation to three hundred gallons.
' In answer to this it is enough to say, that the legislature has not done what is supposed by the plaintiff's counsel it might do. But if the legislature cannot' extend the license to twenty-eight gallons, what shall be the constitutional limit ? By what rule shall it be ascertained. ? Shall a gallon, a quart, or a pint be the limit ? This is altogether arbitrary, and must depend upon the discretion of the lawmaking power, — the same discretion that imposes a tax, defines offences and prescribes their punishment, and which controls the internal policy of the State. Will it be contended that the legisla-, ture cannot exercise the power, as it may be exercised beyond' the proper limit ? This logic is not good when applied to the practical operations of the government. The argument is, power may be abused, therefore it cannot be exercised. What power dependent on human agency may not be abused?
*592 In all matters of government, and .especially of police, a wide discretion is necessary. It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require' restraints that can only be imposed by the legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil tó be remedied. Under the pretence of a police regulation, a State cannot counteract the commercial pqwer of Congress. And yet, as has been" shown, to guard the health, morals, and safety of the community, the laws of a State may prohibit an importer from landing his goods, and may sometimes authorize their destruction. But this exception to the operation of the general commercial law is limited to the existing exigency. Still, it is clear that a law of a State is not rendered ain-constitutional by ah incidental reduction of importation. And especially is this not the case,-when the State regulation has a salutary tendency on society, and is founded on the highest moral considerations.
The police power of a State and the foreign commercial power of Congress must stand together. .Neither of them can be so exercised as materially to affect the other. The sources and objects of these powers are exclusive, distinct, and independent, and are essential to both governments. The one operates upon our foreign intercourse, the other upon the internal concerns of a State. The former ceases when the foreign product becomes commingled with the other property in the State. At this point the local law attaches, and regulates it as it does other property. The State cannot, with a view to encourage its local manufactures, prohibit the use of foreign articles, or impose such a regulation as shall in effect be a prohibition. But it may. tax such property-as it taxes other and similar articles in the State, either specifically or in the form of a license to sell. A license may be required to' sell foreign articles, when those of a domestic manufacture are sold without one. And if the foreign article be injurious to the health or morals of the community, a State may,,in'the exercise of that great and' conservative police power which lies at the foundation of its prosperity, prohibit the sale of it. No one doubts this, in relation to infected goods or licentious publications. ■ Such a regulation must be made in good faith, and have for its sole object the preservation of the health or morals of society. If a foreign spirit should be imported containing deleterious ingredients, fatal to the health of those who use it, its sale may be prohibited.
When in the appropriate exercise of these federal and State powers, contingently and incidentally their lines of action run into each other ; if the State power be necessary to-the preservation of the mórals, the health, or safety of the community, it must be main *593 tained. But this exigency is not to be founded on any notions of commercial policy, or sustained by a course of reasoning about that which may be supposed to affect, in some degree, the public welfare. The import must be of such a character as to produce, by its admission or use,- a great physical or moral evil. Any diminution of the revenue arising from this exercise of local power would be more than repaid by the beneficial results. By preserving, as far as possible, the health, the safety, and the moral energies of society, its prosperity is advanced.
In McCullough v. The State of Maryland, 4 Wheat. 428, this court say, —“ It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable,, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure' of the government itself. In imposing a tax, the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.”
“ The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence, of the constituents over their representatives, to guard them against abqse.” -
Believing the laws of Massachusetts to regulate licenses for the sale of spirituous liquors to be constitutional, I affirm the judgment in this case.
Andrew Peirce, Jr., and Thomas W. Peirce, v. The State of New Hampshire.
This-is a writ of error to the Supreme Court of New Hampshire,' on a judgment given by that court, sustaining the validity of the act of that State, “ regulating the sale of wines and spirituous 'liquors,” “ approved 4th July, 1838 ” ; which is alleged to be in violation of' the constitution of the United States, and the revenue acts of Congress made m pursuance thereof.
The first section provides, “ that if any person shall, without license from the selectmen of the town, &c., sell any wine, rum, gin, brandy, or -other spirits, in any quantity, &c., such person, so offending, for each and every such offence, &c., shall pay a sum not exceeding fifty dollars,” &c. The indictment charged the defendants in the State court with having sold one barrel of gin without a license.
On the trial, if was proved that the barrel of gin was purchased by the defendants in Boston, brought. coastwise to the landing at Piscataqua Bridge, and thence to the defendants’ store in Dover, and afterwards sold in the same barrel.
The views expressed by me in the case óf Thurlow v. The *594 State of Massachusetts, at the present term, as regards the power of a State to require a license for the sale of spirituous liquors, apply equally to the present case. A State may require a license to sell ardent spirits of domestic manufacture, as well as foreign. And the only difference between this case and the one above cited is, that the defendants imported this barrel of gin from the State of Massachusetts to that of New Hampshire, where ■ they sold it; and they claim- the right of importers to sell without a license.
In the case of Brown v. The State of Maryland, 12 Wheat. 449, after sustaining the right of the importer to sell a package of foreign goods without a license, which an act of Maryland required, the court say, — “It may be proper to.add, that we suppose the principles laid down in this case -to apply, equally to importations from a sister State.”
This remark of the court was incidental to the question before it, and the point was riot necessarily involved in the decision. Whilst the remark cannot fail to be considered with the greatest respect, coming as it did from a-most learned and eminent chief justice,-yet it cannot be received as authority. It must have been made with less consideration than the other points ruled in that important case.
The- power to regulate commerce among the several States is given to Congress in the same words as the power over foreign commerce. But in the same article it is declared, that “ no preference shall be given by any regulation of commerce or revenue-tp the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another.” And it is supposed that the declaration, “ that no. State, without the consent of Congress, shall Iky any impost or duties on imports- or exports, except what may be absolutely-necessary for executing its inspection laws,” refers to foreign commerce.
A revenue to the general government could never .háve been contemplated from any regulation of commerce among the severa] States. Countervailing duties, under the Confederation, were'im-. posed by the different States to such an extent as to endanger the confederacy. But this cannot bev done under, the constitution by Congress, in whom the power to regulate commerce among the States is vested.
The word import, in a commercial sense, means the goods or other articles brought into this country from abroad, — from another' country. In this sense an importer is a person engaged in foreign commerce. And it appears that in the acts of Congress which regulate, foreign commerce he is spoken of in that light. In Brown v. The State of Maryland, 12 Wheat. 443, the court say, the act of Maryland “ denies to the importer the right of using the privilege which he has purchased from the United State.s, until he has •purchased it from the State.” ' And it was upon the ground.that .the tax was an additional charge or impost upon the thing imported, ■ *595 which a State could not impose, that the above act was held to be unconstitutional.
But neither the facts nor the reasons of that case apply to a person who transports an article from one State to another. In some cases, the transportation is only made a few feet or rods, and generally it is attended with little risk ; and no duty is paid to the federal or State government. And why should property, when conveyed over a State line, be exempt from taxation which is common to all other property in the State ?
There is no act of Congress to which the license law, as applied to this case, can be held repugnant. And the general “ power in Congress to regulate commerce among the several States,” under-the restrictions in the constitution, cannot affect the validity of the law. -The constitution prohibits impost duties on a commercial-interchange of commodities among the States. The tax in the form of a license, as here presented, counteracts no policy of the federal government, is repugnant to no. power it can exercise, and is imposed by the exercise of an undoubted power in the State. The license system is a police regulation, and, as modified in the State of New Hampshire, was designed to restrain and prevent immoral indulgences, and to advance the moral and physical welfare of society.
The owner of the property, who purchased it in Massachusetts and transported it to New Hampshire, is not an importer in the sense in which that term is used in the case of Brown 'v. The State of Maryland. And there is nothing in the general reasoning of that case, or in the facts, which can bring into doubt the constitutionality of the New Hampshire law.
If the mere conveyance of property from one. State to another shall exempt it from taxation, and from general State regulation, it will not be difficult to avoid the police laws of any State, especially by those who live at or near the boundary. If this tax had been laid on the property as an import into the State, the law wOuld have been repugnant to the constitution. It would have been a regulation of commerce among the States, which has been exclusively givén to Congress. One of the objects in adopting the constitution' was, to regulate this commerce, and -to prevent the States from imposing a tax on' the commerce of each other. If this power has not been delegated to Congress, it is still retained by the States, and may be exercised at their discretion^ as before the adoption of the constitution. For if it be a reserved power, Congress can neither abridge nor abolish it. ,<
But this barrel of gin, like all other property within the State of New Hampshire, • Was liable to taxation by the State. It comes under the general regulation, and cannot be sold without a license. The right of an importer of foreign spirits to sell in the cask, without a license, does not attach to the plaintiffs in error, on account *596 of their having transported this property from Massachusetts to New Hampshire. I affirm the judgment of the State court.
Joel Fletcher v. The State of Rhode Island.
This is a writ of error to the Supreme Court of Rhode Island, 'under the 25th section of the Judiciary Act of-1789. Fletcher was .indicted for selling strong liquor, to wit, rum, gin, and brandy, in less quantity then ten gallons, in violation of the law of Rhode Island. From the evidence, it appeared that the brandy which 'he sold was purchased by him at Boston, in the State of Massachusetts, that it was imported into the United States from France for sale, and that the duties had been regularly paid at the port of Boston. The sale of the liquor was admitted by the defendant, as charged in the indictment.
In the defence it was insisted, that the license act was void, it being repugnant to that clause of the 8th section of the constitution, of the United States which provides, “ that the Congress shall have power to lay and collect taxes, duties, imports, and excises, to pay debts, and provide for the common defence and general welfare of the United States but all duties, imposts, and excises shall be uniform throughout the United States ” ; and is also repugnant to that clause of the 8th section which provides, “ that Congress shall have power to'regulate commerce with-foreign nations, and among the -several States, and with the Indian tribes ” ; and also repugnant to that clause which declares, that “no State shall, without the consent of Congress, lay any imposts or duties on imports, except what may be absolutely necessary for executing its inspection laws, arid the acts of Congress in pursuance of the aforesaid several clauses of said constitution,” Stc.
The Supreme Court of the State -maintained the validity of the State statute, and tb reverse that judgment this writ of error is prosecuted.
The opinions given by me in the cases of Thurlow v. The State of Massachusetts, and Peirce et al. v. The State of New Hampshire, decide, so far as I am concerned, -this case. The first case related to the sale of spirits of foreign importation, not in the hands of ihe importer; the second, to domestic spirits transported from one State to ^another. And the indictment now under consideration relates to the sale of foreign spirits, purchased in Massachusetts and transported to Rhode Island. There is, however, one point made in this case, which was not embraced by the facts contained in either of the others. It was “ agreed, that the town council of Cumberland, in Rhode Island, refused to grant any license for retailing strong liquors for a year from April, 1845, having been instructed to that effect by a town meeting.” The effect of this proceeding was to prohibit the sale of spirituous liquors in the town of Cumberland in less quantities than ten gallons.
*597 There is no constitutional objection to the exercisé of this discretion under the- authority of the State law. In the first place, no system of licenses to retail spirits has authorized the grant, except upon certain conditions. No one, it is presumed, can claim a license to retail spirits as a matter of right. Under the law of the State, a discretion, is to be exercised, not only as regards the' individuals who apply, but also as to the number that shall be licensed .in each town. And, if it shall be determined that a certain town is not entitled to a license, it is not perceived how such a decision can be controlled. In the case of Fletcher, it seems that the town council, who have the power to make the grant, were influenced to refuse- it by the popular vote of the town. A more satisfactory mode of instructing public officers,' it would seem, could not be adopted.
This produces no restriction on the sale of spirits in any quantity exceeding ten gallons. And there is nothing in' the record which shows that licenses are not granted in the adjacent towns within the State. But if this did appear, it would not avoid the force of the act. I think this regulation is clearly within the .power of the State of Rhode Island, and, consequently, that the act is not repugnant to the'constitution-of the United States, orto any act of Congress passed in pursuance of it. I therefore affirm the judgment of the Supreme Court.
Mr. Justice CATRON.
Peirce and another v. New Hampshire.
Andrew Peirce and two others were indicted for selling one barrel of gin, contrary to a statute of New Hampshire, passed in 1838, which provides, that if any person shall, without license from the selectmen of the town- where such person resides, sell any wine, rum, gin, brandy, or other spirits, in any quantity, or shall sell any. mixed liquors, part of which are spirituous, such person so offending, for each offence, on conviction upon an indictment, shall forfeit and pay a sum not exceeding fifty dollars, nor less than twenty-five .dollars, for the use pf the county.
The barrel of gin had been purchased by the defendants at Boston, in the Commonwealth of Massachusetts, and was brought coastwise by water near to Dover, in New Hampshire, where it was sold in the same barrel and -condition that it had been purchased in Boston. Part of the regular business of the defendants was to sell ardent spirits in large quantities.
The defendants’ counsel contended, on the trial, that the statute of 1838 was-unconstitutional and void, because the same is in violation of certain public treaties of the United States with Holland, France, and other countries, containing stipulations for the admission- of spirits into the-United States, and because it is repug *598 nant to the two following clauses in the constitution of the United States, viz.: —
“ No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.”
The Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.”
In answer to these objections, the court instructed the jury, that the statute of July 4, 1838, was not entirely void, if it might have an operation constitutionally in any case; and that, as far as this case was concerned, it could not be in violation of any treaty with any foreign power which had been referred to, permitting the introduction of foreign spirits into the United States, because the liquor in question here was proved to be American- gin.
The court further instructed the jury, that this statute, as it regarded this case, was not repugnant to the clause in the constitution of the United States providing that no State shall, without the consent of Congress, lay any duty on imports or exports, because the-gin in this case was not a foreign article, and was not imported into, but had been manufactured in, the United States.
The court further instructed the jury, that this State could not regulate commerce between this and other States ; that this State could' not prohibit the introduction of articles from another State with such a view, nor prohibit a sale of them with such a purpose ; but that, although the State could not make such laws with such views and for such purposes, she was not entirely forbidden to legislate in relation to articles introduced from foreign countries or from other States ; that she might tax them the same as othev property, and might regulate the sale to some extent; that a State might pass’ health and police laws which would, to a certain extent, affect foreign commerce, and commerce between the States ; and that this statute was a regulation of that character, and constitutional.
The jury found the defendants guilty, and the Court of Common Pleas fined them thirty dollars ; from which they prosecuted their writ of error to the Superior Court of Judicature of New Hampshire, where the judgment was affirmed. The present writ of error is prosecuted, under the twenty-fifth section of the Judiciary Act of 1789, to reverse the judgment of tne State court of New Hampshire, on the grounds above stated. And the question and the case presented for our consideration are, whether the State laws, and the judgment founded on them, are repugnant to the constitution of the United States. The court below having decided in favor of their validity, this is the only question that comes within our jurisdiction, although divers others were presented to and adjudged by the State court.
The importance of this case, as regards its bearing on the com- *599 iderce among the States, and on the relations and rights of their citizens and inhabitants, is not to be disguised. To my mind it presents most delicate and difficult considerations.
The first objection, that the statute of New Hampshire violated certain treaties with Holland, France, &c., providing for the admission of ardent spirits, has no application to the- case, as the spirits sold were not foreign, but American gin.
The second objection relies on the first article and tenth section of the constitution, which provides, that “no State shall lay any imposts or duties on imports or exports, nor any duty on tonnage,” unless with.the assent of .Congress, &cv These áre negative restrictions, where the constitution operates by its own force ; but as no duty or tax was imposed on the gin introduced into New Hampshire from Massachusetts, either directly or indirectly, these prohibitions on the State power do not apply
The third objection proceeds on the clause, that “the Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes,” to which it is insisted the State statute is opposed. The power given to Congress is unrestricted, ■ and broad as the subjects to which it relates ; it extends to all lawful commerce with foreign nations, and in the same terms tn all lawful commerce among the States ; and “among” means. Detween two only, as well as among more than two ; if it was otherwise, then an intermediate State might interdict and obstruct the transportation of imports over it to a third State, and thereby impair the general power. The article in question was introduced from one State directly into another, and the first question is, Was it a subject of lawful commerce among the States, that Congress can regulate ? That ardent-spirits have been for ages, and now are, subjects of sale and of lawful commerce, and that- of a large class, throughout a great portion of the civilized world, is not open to controversy ; so our commercial treaties with foreign powers declare them to be, and so the dealing in them among .the States of-this Union recognizes them to be. ' But this condition of the subject-matter was' met by the State decision on the ground, and,On this only, “that the State might pass health and police laws which would, to a certain extent, affect foreign commerce and commerce between the States ; and that the statute [of New Hampshire] was a regulation of that-character, and constitutional.”
This was the charge to the jury, and on it the verdict and judgment are founded, and which the State court of last resort affirmed. The law and the decision apply equally to foreign and to domestic spirits, as they must do on. the principles assumed in support of the law. The assumption is, that the police power was not touched by the constitution, but left to the States as the constitution- found- it. This' is . admitted ■; and whenever a thing-, from character, or condi *600 tion, is of a description to be regulated by that power in the State, then the regulation may be made by the State, 'and Congress cannot interfere. -But this must always depend on facts, subject to legal ascertainment, so that the injured may have redress. And, the fact must find its support in this, whether the' prohibited article belongs to, and is subject to be regulated as part of, foreign commerce, or of commerce among the States. If, from its nature, it does not belong to commerce", or if its condition, from putrescence or other cause, is such when it is about to enter the State that it no longer belongs to commerce, or, in other words, is not a commercial article, then the State power may exclude its introduction. And as an incident to this power, a State may use means to ascertain the fact. And here is the limit between the' sovereign power of the State and the federal power. That is say, that which does not belong to commerce is within the jurisdiction of the police power of the State ; and that which does belong to commerce is within the jurisdiction of the United States. And to this limit must all the general views come, as I suppose, that were suggested in the reasoning of this court in the cases of Gibbons v. Ogden, Brown v. The State of Maryland, and New York v. Miln.
Whait, then, is the assumption, of the State court ? Undoubtedly, in effect, that the. State had the power to declare what should, be an article of lawful commerce in the particular State ; and, having declared that ardent spirits and wines were deleterious to morals and health, they ceased to be commercial commodities there, and that then the police power attached, and consequently the powers of Congress could not interfere. The exclusive State power is made' to rest, not on the fact of the state or condition of the article, n.or that it is property usually passing by sale from hand to hand, but on the declaration found in the State laws, and asserted as the State, policy, that it shall, be excluded from commerce. And by this means-the sovereign jurisdiction in the State is attempted to be' created, in a case where it did not previously exist.
If this be the true construction of the constitutional provision, then the paramount power of Congress to regulate commerce is subject to a very material limitation ; for it takes from Congress, and leaves with, the States, the power to determine the commodities, or articles of property, which are the subjects of lawful commence. Congress may regulate, but the States determine what shall or shall not be regulated.
Upon this theory, the power to regulate commerce, instead of' being paramount over the subject,■ would become subordinate to the State police power ; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in efFect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, *601 as the. power to regulate is dependent upon the power to fix and determine upon the 'subjects to be regulated.
The same process of legislation and reasoning adopted by the State and its courts could bring within the police power any article of consumption that a State might wish to exclude, whether it belonged to that which was'drank, or to food and clothing ; and with nearly equal claims to propriety, as malt liquors and the produce of fruits other than grapes stand on no higher grounds than the light wines of this and other countries, excluded, in effect, by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in food and clothing. And in this connection it may be proper to say, that the three States whose laws are now before us had in view an entire prohibition from use of spirits and wines of every description, and that their main scope and object is to enforce exclusive temperance as a policy of State,, under.the belief that such a policy will best subserve the interests of society ; and that to this end, more than to any other, has the sovereign power of these States beett exerted ; for it was admitted, on the argument, that no - licenses are issued, and that exclusion exists, so far as the laws can produce the result, — at least, in some of the States, —and that this was the policy of the law.' For these reasons, I think the case cannot depend on the reserved power in the State to regulate its own police.
Had the gin imported been “ an import” from a foreign country, then the license law prohibiting its sale by the importer would be void. The reasons for this conclusion are given in my opinion on the case of Thurlow v. The Commonwealth of Massachusetts, and need not be repeated, and are founded on the case of Brown v. The State of Maryland. The next inquiry is, did it stand on the foot of “ an import,” coming, as it did, from anpther State ? If it be true, as the State courts held it was, that Congress has the exclusive power to regulate commerce among the States (the States having none), and the gin introduced being an article of commerce, and the State license law being a regulation of commerce (as it was held by this court to be in the case of Brown v. The State of Maryland), then the State law is void, because the State had no power to act in the matter by way of regulation to any extent.
This narrows the controversy to the single point, whether the. States have .power to regulate their own mode of comiiier.ee among the States, during the time the power of Congress lies dormant, and has not been exercised in regard to such commerce.
Although some regulations have been made by Congress affecting the coasting trade, requiring manifests of cargoes where 4hey- exceed a certain value, to prevent smuggling, and for .other-purposes, still, no regulation exists affecting, in any degree, sucli- an' impoi't as the one'under consideration. It must find protection against tlie State law under the.constitution, or it can have none. • This is also *602 true as respects similar articles of commerce passing from State to State by land. Congress has left the States to proceed in this regard as they were proceeding when the constitution was adopted.
Is, then, the power of Congress exclusive ? .The advocates of this construction insist, that it has been settled by this court that the power to regulate commerce is exclusive, and can be exercised by.Congress alone. And the inquiry in advance- of further discussion is, Has the construction been thus settled ? The principal case relied on is that of Gibbons v. Ogden, 9 Wheat. 1, in support of the assumption. In that case a monopoly had be6n granted to the inventers of machinery propelled by steam, whidi, when applied to vessels, forced them'through the water. The law of' monopoly of New York extended to the ti’de-waters, and for navigating these with two steamboats belonging to Gibbons, a bill was filed against him, and he was' enjoined by the State- courts of New York; and in his answer he reHed on licenses granted under the-act of 18th February, 1793, for, enrolling and -licensing ships and vessels to be employed in the coasting trade, and for regulating the same. This was the sole defence. The court first held that the power to regulate.commerce included the power to -regulate navigation also, as an incident to, and part of, commerce.
After discussing many topics connected, with, or supposed, to be connected with, the subject, the power of taxation was considef-v ed by the court, and the powers to tax in the States and the United States compared with the power to regulate commerce, and in tins connection the chief justice, delivering die opinion of the court, said, — “But, when a State proceeds to regulate commerce-with foreign nations, or among the several States, it is exercising the very power granted to Congress, and is doing the very thing which Congress is authorized to do. There is no analogy, then, between the power of taxation .and the power of regulating commerce. In discussing the question, whether this power is still in the States, in the case under consideration, we may dismiss from it the inquiry, whether it is surrendered by the mere grant i -Congress., or is retained until Congress shall exercise the power. We may dismiss that inquiry, because it has been exercised, and the regulations Congress deemed proper to make are.now in full operation. The sole question is, Can a State -regulate commerce with foreign nations, and among the SMes, while Congress is“regulating it ? ”
And then the court proceeds to discuss the effect of the licenses set up in Gibbon’s answer, and gives a decree of reversal, on that sole, question, in his favor. The decree says, — “ This court is of opinion, that the several licenses to the steamboats the Stoudinger and the Bellona to' carry on the coasting trade, which are set up by the appellant, Thomas Gibbons, in his answer, which were granted under an act of Congress passed in pursuance of the constitution of the United States, gave full authority to those vessels to navigate *603 the waters of the United States, by steam or otherwise, for the pur-, pose of carrying on the coasting trade, any law of the State of New York to the contrary notwithstanding.” And then the State law is declared void, as repugnant to the constitution and laws of the United States. 9 Wheat. 240.
This case, then, decides that navigation was within the commercial power of the United States, and that a coasting license granted pursuant to an act of Congress, in the exercise of the power, was an authority under the supreme law to navigate the public waters of New York, notwithstanding the State law'granting 'the monopoly. This decision was made in 1824. Three years after (1827) the case, of Brown v. The State of Maryland came before the court. 12 Wheat. 419.
Brown, an importing merchant, had been indicted for selling packages of dry goods in the form they were imported, without taking out a- license to sell by wholesale. To this he demurred., and the demurrer was sustained, on the ground that “ imports ” could be sold by the importer regardless of the State law, on which the indict-mént was founded. Two propositions were stated by the court, and the decision of the cause proceeded on them both, and was favorable to Brown : — First, The provision of the constitution which declares, that “ no State shall, without the consent of Congress, lay any imposts or duties'on imports or exports.” And, second, That which declares Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.
The first proposition has no application to the controversy before us, as here no tax'or duty was imposed.
2. The court proceeds (p. 446) to inquire of the extent of the power, "and says, it is complete in itself, and acknowledges no limitations, .and is coextensive with the subject on which •it operates.”. And for this Gibbons v. Ogden is referred to, as having asserted the same :postulates. Thé opinion then urges the necessity that Congress should have power over- thé whole subject, and the power to protect the imported article in the hands, of the importer,- and proceeds to say, — “We think it cannot be denied what can be the meaning--of an act of Congress which authorized importation, ánd offers the privilege for sale at a fixed.-price to every person who chooses to become a purchaser.” “ We think, then, that if the power.-to-authorize a sale exists in Congress, the conclusion that the right' to sell -is connected with the law permitting importation, as. an inseparable incident, is inevitable.” ' •
'Two -points were deciced on the second proposition : — 1st. That a fx on the importer was a tax on the import.
2d That “ an import,” which had paid a tax to .the United. States according to the regulations of commerce made by Congress, could'not be taxed a second lime in the hands of the importer.
Neither of these cases touch thé question of exclusive power, nor *604 do I suppose it was intended - by the writer of the opinions to approach that question, as he studiously guarded the opinion in the leading case of Gibbons v. Ogden against such an inference; and professedly followed the doctrines there laid down in Brown v. The State of Maryland. :
The next case -that came before the court was that of Willson et al. v. The Blackbird Creek Marsh Company, in 1829, 2 Peters, 257. The chief justice again delivered the. opinion-of the court, as he had done in the.’ two previous cases. The company was authorized to make a dam across the creek under a State charter. The creek was a navigable tide-water; the dam was constructed, and the licensed sloop of Willson not being enabled to pass, be broke the dam, and the company sued him for damages ; to which he pleaded, that the creek was a navigable highway, where the tide ebbed and flowed, and that he only did so much damage as to allow his vessel to pass. The plea, was demurred to, and there was a judgment against Willson in the. State court. . It was insisted on. his behalf in this .court fhat- the.pja-wsf/to' regulate .commerce included navigation ; and tflat* aivigable Streams are the waters-of the United-States, and subject to" the power of Congress ; and the casé of Gibbons a. Ogden was relied on. The chief justice in the opinion said : — “ The counsel for the plaintiff in error insists that it comes in conflict with the powers of the United States to regulate commerce with foreign nations, and among the several States.
“ If Congress had passed any act which bore upon the case', any act in execution of the power to regulate -commerce, the object qf which was' to control State legislation over those small navigable creeks into which the tide flows, and which abound throughout the’ lower country of the Middle and Southern States, we should feel not ■ much difficulty in saying, that a State law coming in conflict with such act would be-void. But Congress has passed no such act. The repugnancy of the law of Delaware to the constitution is placed entirely on -its repugnancy to the power to regulate commerce with foreign nations and among the several States ; a power which has not beyn so exercised as to affect the question.
“ We do not think'that the'act empowering the Blackbird Creek Marsh Company to place a dam across the creek1 can, under all the circumstances of the case, be considered as repugnant to. the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject.”
■ Here the adjudications end-. But judges, who were of the court when the three cases cited were determined, differ as .to- the- true meaning of the chief justice in the language employed in the case of Gibbons v. Ogden, in illustrating the constitution in aspects supposed to bear more or less on the questions before the court ; such, for instance, as that the commercial power was a unit, and Covered the entire subjectrmatter of commerce with foreign nations and *605 among the States ; and that navigation was included in the power. In the case of New York v. Miln, 11 Peters, 102, Mr. Justice Thompson and Mr. Justice Story differed entirely as to what the language employed in the opinion in Gibbons v. Ogden meant, in regard to the true exposition of the constitution ; — one contending that the language used had reference to the power of Congress, and to a case where it had been fully exercised ; the other insisting that the opinion maintained the exclusive power in Congress to regulate commerce, and that the States had no authority to legislate, but were altogether excluded from interfering. This was Mr. Justice Story’s opinion. I think it must be admitted that Chief Justice Marshall understood himself as Mr. Justice Thompson understood him, otherwise he could not have held as he did in the last case, in 1829, of Willson v. The Blackbird Creek Marsh Company. And as this case was an adjudication on the precise question whether the constitution of the United States, in itself, extinguished the powers of the States to interfere with, navigation on tide-water, and as it was adjudged, in the case of. Gibbons v. Ogden, that the power to regulate commerce included navigation as fully as if the clause had expressed it in terms, it is difficult to say that this case does not settle the question favorably to. the exer'cise of jurisdiction on the part of the States, until Congress shall act on the same subject and suspend the State law in its operation. But, owing to the conflicting; opinions of individual judges, it is deemed proper to treat the^question as though it was an open one, in the aspect that this case presents-it; and then the consideration arises, — Can a State, by. its general laws, operating on all persons and property within its jurisdiction, reguláte articles coming into the State from other States, and prohibit their sale, unless a license is obtained by the person bringing them in ; and where no táx or duty is demanded of the person, or imposed on the article.?
In this proposition, it is not intended to involve the consideration, that where ’ Congress regulates a particular commerce- by general laws, as .where a tax is levied on some articles on being- introduced from abroad,, and others permitted to come in free, that all are regulated ;■ this I admit in the-instance put, and in all others of a like character. But as no general law of Congress has regulated commerce among the States., such' a rule cannot apply here.
To a true understanding of the power conferred on Congress to regulate commerce among the' States, it may be proper briefly to refer to their-condition and acts before the constitution was adopted, in this respect. The prominent evil was, that they taxed the commerce of each other directly and indirectly ; and to secure themselves from undue and opposing taxes, the constitution first provides, that Congress shall lay no tax on articles exported -from any State second, that no State shall -lay any imposts or duties on imports or exports; nor, third, lay any duty on tonnage, without *606 the consent of Congress, except so much as may be necessary for executing its inspection laws. These are prohibitions, to which the States have conformed.
But, as many general and all necessary local regulations existed when the constitution was adopted, and this, in all the States, affecting the end of commerce within their respective limits, the local regulations were continued, so far as the constitution left them in force. And they have been added to and accumulated to a great extent up to this time in the maritime States, not only as regards commerce among the States, but affecting foreign commerce also ; the States, within their harbours and inland waters, have' done almost every thing, and Congress next to nothing. So minute and complicated are the wants of commerce when .if reaches its port of destination, that even the State legislatures have been incapable of providing suitable means for‘its regulation between ship and shore, and therefore charters, granted by the State legislatures, have conferred the power on city corporations. Owing to situation and climate, every port and place where commerce enters a State must have peculiarity in its regulations ; and these it would be exceedingly difficult for Congress to make ; nor could it depute the power tb corporations, as the.States do. , Thé difficulties standing in the way of Congress are fast increasing with the increase of commerce and the places where it is carried on. And where it enters States through their inland borders, by land and water, the complication is not less, and especially on the large rivers. There, too, Congress hás the undisputed power to regulate commerce'coming from State to State; but as every village would require special legislation, and constant additions as it grew and-- its commerce increased, to deal with the subject on the part of Congress would be next to impossible in practice., I admit that this condition of things. does not settle the question of contested power ; but it satisfactorily shows that Congress cannot do what the States have done, are doing, and must continue to do; from a controlling necessity, even should the exclusive'power in Congress be maintained by our .decision. And this state of things was too prominently manifest for the convention to. overlook it. Nor do I suppose-they did so, for the following reasons.
The general rules of construction applicable to the negative and affirmative powers of grant in the constitution are commented on in the 32d number of the Federalist, in these terms: — “ That, notwithstanding the affirmative .grants of general, authorities, there has been the most pointed care, in those cases where it was. deemed improper that the like authorities should reside in the States, to insert negative clauses prohibiting the exercise, of them by the States. The tenth section of the first article consists altogether of such provisions. -This circumstance is a clear indication of the sense of the -convention, and furnishes a rule of interpretation out of the body of the act, which justifies the position I have advanced, and *607 refutes' every hypothesis to the contrary.” That is, in favor of the State power. These remarks were made to quiet the fears of the people, and to clear up doubts oh the meaning of the constitution, then before them for adoption by the State conventions. And it is an historical truth, never, so far as I know, denied, that these papers were received by the people of the States as the true exponents of the instrument submitted for their ratification.' Proceeding on the principle of construction applicable to affirmative statutes, — that they stood together as a general rule, if there were no negative words, — and taking the doctrine laid down in the Federalist to be the true rule of interpretation, — that where the States were intended tó be ■ prohibited negative words had been used, —■ the States continued to do what they had previously done, and were not by negation prohibited from doing'; that is to say, to exercise the powers conferred on Congress in' arming, and organizing, and disciplining the militia, to pass bankrupt laws, and to regulate the details of commerce within their limits, coming from other States and foreign countries.
The exercise of the powers to regulate the militia, and to pass bankrupt laws, has not the approval of this court in the cases of Houston v. Moore, and in Ogden v. Saunders.
As to' the existence, of the power in the States in these two instances, there is no further controversy here or elsewhere.
And in regard to. the. third, Congress has stood by for nearly sixty years, and seen the States regulate the commerce of the whole country., .more or less, at the ports of .entry and at all their borders, without objection, and for this court now to decide that the power did not. exist in the States, and that all they had done in this respect Was void from the beginning, would overthrow and annul entire codes of State legislation on the particular subject. We would by our. decision expunge more State laws and city corporate regulations than Congress is likely to make- in a century- on the same subject, and-on no better assumption than that Congress and the State legislatures had .been altogether, mistaken as-to their respective powers: for-fifty,-years and inore. If long usage, general acquiescence, and the absence of complaint can settle the .interpretation-of the clause .in question, then it should be deemed as settled in conformity to the usage by the courts.
And as Congress and the courts have conceded that the States may pass laws regulat-ing..the militia, and on the. subject of bankruptcies,: and- that the affirmative grants of power to Congress in these instances did not deprive the States from exercising the power until Congress acted, it is now too late, under existing circumstances, for this court to say that the similar affirmative • power to regulate .commerce with foreign nations and among the States shall be held an exclusive power in Congress ; as it coüld no more be done with consistency of interpretation, than with safety to the existing state of the country.
*608 In proceeding on this moderate, and, as I think, prudent and proper construction, all further difficulty will be obviated in regard to the admission of property into the States ; this the States may regulate, so they do not tax ; and if the States (or any one of them) abuse the - power, Congress can interfere at pleasure, and remedy the evil; nor will the States have any right to . complain. And so the courts can interfere if the States assume to exercise an excess of power, or act on a subject of commerce that is regulated by Congress. As already stated, it is hardly possible for Congress to deal at all with the details ,of this complicated matter.
The case before us presents a fair illustration of the' difficulty ; all venders of . spirits produced in New Hampshire are compelled to be licensed before they can lawfully sell; this is not controverted;, and cannot be. To hold that the State license law was void, ás-respects Spirits coming in from other States as articles of commerce, Would open the door to an almost entire evasion, as the spirits, might be. introduced in the smallest divisible quantities that the retail trade would require ; the consequence of which would be, that the dealers in New Hampshire would sell only spirits produced in other States,^ and that the products of New Hampshire would find an.unrestrained market in the neighbouring States having similar license laws to those of New Hampshire.
For the sake of convenience, the views on which this opinion, proceeds will bé briefly restated.
1. It is maintained, that spirits and wines are articles belonging to foreign commerce and commerce among the States ; and that Congress can regulate their introduction and transmission into and through the States so long as they belong to either class of such commerce, but no further.
2. That any State law whose provisions- are repugnant to the existing regulations of Congress (Within the above limit) is void, so far as it is opposed to the legislation of Congress.
3. That the police power of the Stajtes was -reserved to the States, and that it is beyond .the reach of Congress ; but that such •police power extends to articles only which do not belong to foreign commerce, or to commerce' among the States, at the time the police power is exercised in regard to them ; and that the fact of their condition is a subject proper for judicial ascertainment.
4. That the power to regulate commerce among the States may be exercised by Congress at pleasure, and the States cut off from regulating the 'same commerce at the same time it stands regulated by Congress.; but that, until such regulation is -made by Congress, the States may exercise the power within their respective limits.
5. That the law of New Hampshire was a regulation of commerce among the States in regard to the article for selling of which the defendants were indi.cted and convicted ; but that the State law was constitutionally passéd, -because of the power of the State thus *609 to regulate ; there being no regulation of Congress, special or general, in existence to which the State law was repugnant.-
And, for these reasons, I think the judgment of the-State court should be affirmed.
Thurlow v. Massachusetts.
The statute of Massachusetts provides, that no person shall presume to be a retailer .or seller of wine, brandy, rum, or other spirituous liquors, in a less quantity than twenty-.eight gallons, and that delivered and carried away all at one time, unless he is first licensed as a retailer of wine and spirits, as is provided in this chapter, on pain of forfeiting twenty dollars for each offence.
The plaintiff, Thurlow, was found guilty by a jury for violating this law, on which verdict the Supreme Judicial Court of Massachusetts pronounced judgment; and from which a writ of error was prosecuted to this court under the twenty-fifth section of the Judi-. diciary Act of 1789. The bill of exceptions shows that some of the sales charged, in the indictment were of foreign liquors ; in regard to which the court directed the jury that the license law applied as well to imported spirits as to.domestic. It was proved that the defendant below had sold in-quantities of gallons, quarts, and pints, And the question submitted for our consideration is, whether the State law, and. the judgment founded on it, are repugnant to the acts of Congress authorizing the importation of wines, brandies, and other foreign spirits ; and it is proper to remark, that our jurisdiction and power to interfere involve the question merely of repugnance or no repugnance ; if repugnance is found to exist, we must reverse, and if not, we must affirm. • It follows, that the judicial ascertainment of the fact will end the controversy:
For the plaintiff in error it is insisted, that the State law and the judgment founded on it are repugnant to the acts of Congress aur thorizing- the importation of foreign wines and spirits, and to their introduction into the United. States on paying a prescribed tax. That the laws of the States cannot control the retail trade in such liquors ; that if they can to any extent, they may prohibit their sale altogether, and by this means do that indirectly which cannot be done directly, that is to say, prohibit their introduction ; that the purposes of wholesale importation being retail distribution, the.two must go together ; if not, the first ,s of no value ; that importations reach our country in large masses for the sole purposes of diffusion and consumption, and unless Congress has the control of distribution until the imported article reaches the consumer, the power to admit and to regulate commerce in regard to it will be worthless, and little better han a barren theory, leaving us where we began, in 1789. That any law, therefore, that' prohibits consumption necessarily destroys importation ; and the retail process being the ordinary means *610 to consumption, and indispensable to it, to refuse this means would wholly defeat the end Congress has protected ; that is to say, consumption. 'On the soundness of this reasoning, the result' of the controversy depends.
To. this argument we answer, that under the power to regulate foreign commerce, Congress can protect every article belonging to foreign commerce, so long as it does belong to it, from the operation of a tax or a license, imposed by a'State law, that obstructs or hinders the commerce. But the true inquiry here is, how long does the imported article so continue ? The acts of Congress protect “imports,” and prescribe the quantity and measure in which they.shall be made ; the question of more or less is within the competency of Congress, but how long the imported article continues to be “an import”.is a different question-, for so sopn as it ceases to be so, then it is beyond the power conferred on Congress “ to regulate foreign commerce,” and that power cannot afford it further protection. This is the line of jurist iction where the powers of Congress end, and where the powers of the States begin, when-dealing respectively with the imported article. And such is the limit established in the casé of Brown v. The. State of Maryland. I do not mean to say that Congress may not protect an import for the purposes of transmission over land, in the form it was imported, from one State to another, for the purposes of distribution and sale by the importer, as this ‘can be done under the power to regulate commerce- among the States. The question under examination is, not what Congress may do, but what it has done; It has not permitted spirituous liquors .to'be imported in the quantities that they were sold by the plaintiff in error. \nd when the article passes by sale from the. hands of the importer into the hands of another, either for the purposes of resale or of consumption, or is divided into smaller quantities, by breaking up the casks, packages, &c., by'the importer, the article ceases to be a protected “ import,” according to the legislation of Congress as it now, stands, and therefore the liquors sold in this instance did not belong to “ foreign commerce,” when sold at the retail bouse by single gallons, quarts, &c. When thus divided and sold in the body of the State, the-foreign liquors became a part of its property, and were subject to be taxed, or to be regulated by licenses, like any other property owned within the State.
But while -foreign liquors, imported according to the regulations of Congress, remain in the cask, bottle, &c., in the original form, then the importer may sell them in that form at the port of entry, or in any other part of the United States, nor can any State law hinder the importer from doing so ; nor does it make any difference whether the imported article paid a tax on its introduction, or was admitted as a free article ; until it passes from, the hands of-the importer, it is “ an import,” and belongs to regulated “ foreign com-, merce,” and is protected.
*611 It follows from the principles stated, that the spirituous liquors sold by the defendant stood on no higher ground thail domestic spirits did, and that domestic spirits are subject to the State authority as objects of taxation, or of license in restraint of their sale, is not a matter of controversy,.and certainly cannot be here, under the twenty-fifth section of the Judiciary Act,
I admit as inevitable, that, if the' State has the power of restraint by licenses to any extent, she has the discretionary power to judge of its limit, and may go to the length of prohibiting sales altogether, if such be her policy ; and that if this court cannot interfere in the case before us, so neither could we interfere in the extreme case of entire exclusion, except to protect imports belonging to foreign commerce, as already defined. The reasons are obvious. We have no power to inquire into- abuses (if such there be) inflicted by State authority on the inhabitants of the State, unless such abuses are repugnant to the constitution, laws, or treaties of the United States.
For the reasons above set forth, I think the judgment of the Stale court should be affirmed.
And as the case of Joel Fletcher against the State of Rhode Island depends on the same principles,- to every extent, I think it must be affirmed also.
Mr. Justice DANIEL.
In the decision of the court, so far as it establishes ’ the validity of the license laws of the States of Massachusetts, Rhode Island, and New Hampshire, I entirely concur; and had the opinions of judges in forming that decision been limited strictly to an inquiry into the compatibility of those laws with the constitution of the United States, or with a just exercise of State power (the only inquiry, in my apprehension, regularly before the court), I should have been spared the painful duty-of disagreement with my brethren. To. this inquiry, however, those opinions, -according to my apprehension, are by no means restricted. The majority of the judges, in fulfilment of their own convictions, have seemed to me to go beside the questions regularly before them, and in this departure have propounded principles and propositions, against which, whensoever they may be urged as motives for action on my part, I shall feel myself bound most earnestly to protest’. It has been said, that the principles here objected to have been already solemnly and fully adjudged and established, and should therefore be no longer assailed. The assertion as to the extent in which these principles have been ruled, or the solemnity with which they have been fixed and settled, may in the first place be justly questioned. ’It is believed that they have been directly adjudged in a single case only, and then under the qualification of an able dissent.*
*612 But should this assertion be conceded in its greatest latitude, my reply to it must be firmly and unhesitatingly this, — that in matters involving the meaning and integrity of the constitution, I never can consent that the text of that instrument shall be overlaid and smothered by the glosses of essay-writers, lecturers, and commentators. Nor will I abide the decisions of judges, believed by me to be invasions of the great lex legum. I, too, have been sworn to observe and maintain the constitution. I possess- no sovereign prerogative by which I can put my conscience into commission. I must interpret exclusively as that conscience shall dictate. Could I, in cases of minor consequence, consent, in deference to others, to pursue a different course, I should, in instances like the present, be especially reluctant to place myself within the description of the poet,— “ Stat magni nominis umbra.”
The doctrines which to me appear to have been gratuitously brought into this case are those which have been promulged in the reasoning of this court in the case of Brown v. The State of Maryland, reported in 12 Wheaton, 419, — doctrines (and I speak it with all due respect) which I conceive cannot, by correct induction, be derived from the constitution, nor even from the grounds assumed for their foundation in the reasoning of the court in that case ; but which, on the contrary, appear to be wholly illogical and arbitrary. The doctrines adverted to are these. That under the operation of that' provision in the constitution which confers on Congress- the power of regulating commerce with foreign nations, &c., &c., and by the farther provision which prohibits to the States the power of levying imposts or duties on imports, merchandise, or property imported from abroad, — however completely its transit may have been ended, however completely it shall have passed beyond all agencies and obligations in reference to the federal government, and however absolutely, exclusively, and undeniably it shall have become the property, and passed into the possession, of the citizen resident within the State, and protected both in person and ’property by the laws of the State, — shall never become subject to taxation, in common with other property of the same citizen, whilst it shall remain in the bale, package, or form in .which it shall have been imported, nor until (to use the language of the court) it shall have been “ broken up and mingled with the general mass of property.”
With regard to this phrase, “ broken up and mingled with the mass of property,” so often appealed to with the view to illustration, it .may be worth while to remark, in passing, how often words introduced for the purpose of explanation are themselves the means of creating doubt or ambiguity! With respect to the phrase above mentioned, it may be retorted, that a person may import a steam-engine, a piano, a telescope, or a horse, and many other subjects, qbuch could not be broken up in order to be mingled with the *613 general mass of property. If, then, this phrase is to be apprehended as signifying (and this alone seems its reasonable meaning) the appropriation of a subject imported in absolute private right and enjoyment, either positively or relatively, it surrenders- the whole matter in dispute, and admits that all the property of the citizen, who is himself protected in his person and in the enjoyment of his property, is bound to contribute to the support of the government which yields this protection, whether he shall have imported that property, or purchased it at home.
By the 6th article and 2d clause of the constitution it is thus declared : — “ That this constitution and the laws of the United States made in pursuance. thereof, and treaties made under the authority of the United States, shall be the supreme law of the land-. ”
This provision of the constitution, it is to be feared, is sometimes applied or expounded without those qualifications which the character of the parties to that instrument, and its adaptation to the purposes for which it was created, necessarily imply. Every power delegated to the federal government must be expounded in coincidence with a perfect right in the States-to all that .they have not delegated ; in coincidence, too, with the possession of every power •and right necessary for their existence and preservation ; for it is impossible to believe that' these ever were, in intention or in fact, ceded to the general government. Laws of the United States, in order to be binding, must be within the legitimate powers vested by the constitution. Treaties, to be valid, must be made within the scope of the same powers ; for there can be no “ authority of the United States,” save what is derived mediately or immediately, and 'regularly and legitimately, from the constitution. A treaty, no more than an ordinary statute, can arbitrarily cede away any one right of a State or of any citizen of a State. In cases of alleged conflict between a law of the United States and the constitution, or between the law of a State and the constitution or a statute of the United States, this court must pronounce upon the validity of either law with reference to the constitution ; but whether the decision of the court in such cases be itself binding or otherw:se must depend upon its conformity with, or its warrant from, the constitution. It cannot be correctly held, that a decision, merely because it be by the Supreme Court, is to override alike the constitution and the laws both of the States and of the United States. Let us test by these principles — believed to be irrefragablethe power over foreign commerce vested in Congress by the constitution ; and also the positions sought to be deduced 'from that grant of power by the argument in Brown v. The State of Maryland. By art. 1, §8, clause 4,'of the constitution, it is declared, ‘‘that Congress shall have power to regulate commerce with -foreign nations, among the several States, and with the Indian tribes.” !T is with the first of the grants in this article that we- have now to deal. The commerce here *614 spoken of is that traffic between the people of the United States and foreign nations, by which articles are procured by purchase or barter from abroad, or by which the like subjects of traffic are transmitted' from the United States to foreign countries ; keeping in view.always the essential characteristic of this commerce as stamped upon it by the constitution, namely, that it is commerce with foreign nations, or, in other words, thaf it is external commerce. By this, however, is not meant that it should be external in reference to . geographical or territorial lines, but in reference to the parties, and the nature of their transactions. The power to regulate this commerce may properly comprise the times and places at which, the modes and vehicles in which, and the conditions upon which, it may as foreign commerce be carried on ; but precisely at that point of. its existence- that it is changed from foreign commerce, at" that point this power of regulation in the federal government, must cease, the subject for the action of this power being gone. Independently of an express prohibition upon the States to lay duties on imports, this power of regulating foreign commerce may correctly imply a denial to the States of a right to' interfere with existing regulations over subjects of foreign commerce ; but they must be continuing, and still in reality, subjects of foreign commerce, and such they can no longer be after that commerce with regard to them has terminated, and they are completely vested as property in- a citizen of a State, whether he be'the first, second, or third proprietor ; if this were otherwise, then, by the same reasoning, they would remain imports, or subjects of foreign commerce, through every possible transmission of title, because they had been once imported. Imports in a political or fiscal, as well as in-common practical acceptation, are properly commodities brought in from abroad which either have not reached their perfect investiture or their-alternate destination as property within the jurisdiction of the St'ate, or which still are subject to the power of the government for a fulfilment of the conditions upon which they have been admitted to entrance ; as, for instance, goods on which duties are. still unpaid, or which are bonded or in public warehouses. So soon as they are cleared of all control of the government which permits their introduction, and have become the complete and exclusive property of the citizen or resident, they are no longer imports in a political, or fiscal, or common sense. They are' like all other property of the citizen, and should be equally the subjects, of domestic regulation and taxation, whether owned by an importer or his vendee, or may have been purchased by cargo, package, bale, piecé, or yard, or by hogsheads, casks, or bottles. ■ I can perceive no rational distinction which can be taken upon the circumstance of mere quantity, shape, or bulk; of on that of the number of transmissions through which a commodity may have passed from the. first proprietor, or of its- remaining still with the latter. The *615 objection, that a tax upon an article in bulk (the property of a citizen) is forbidden because it is a burden on foreign commerce, whilst a similar burden is permissible on the very same bulk or on fragments of the same article in the hands of his vendee, it would appear difficult to reconcile with sound reasoning. Every tax is alike a burden, whether it be imposed on larger or smaller subjepts, and in either mode must operate on price, and consequently on demand and consumption. If, then, there was any integrity in the objection urged, it should abolish all regulations of retail trade, all taxes on whatever may have been imported.
It cannot be correctly maintained that State laws which may remotely or incidentally affect foreign commerce are on that account to be deemed void. To render them so, they must be essentially and directly in conflict with some power clearly invested in Congress by the constitution; and, I" would add, with some regulation actually established by Congress in virtue of that power. In the case of Brown, v. The, State of Maryland, it is said by the court, that liberty to import implies unqualified liberty to sell at the place of importation. In the argument of this case, the proposition just mentioned does not, in all its amplitude, seem broad enough for counsel, who have contended that liberty to import implies on the part of the States a duty to encourage, if not to enforce, the consumption of foreign merchandise ; arising, it is affirmed, from a farther duty incumbent on the States to regard a priori the acts of the federal government as wisest and best, and therefore imposing an obligation on the States for cooperation with them. These very exacting propositions, it is believed, can hardly be vindicated, either by the legitimate meaning of words, or any correct theory of the constitutional powers of Congress. It cannot be necessary here to institute a criticism upon the words importation, sale, consumption, in order to show either their etymological or ordinary acceptation, or in order to expose the fallacy of the aforegoing new and startling theory. Goods, moreover, may be imported into a country as into a commercial entrepot, for reshipment to other markets, and not for consumption at all. But where importation may have been made with the direct view to sell, it does not follow, by necessary induction, that permission for the former implies permission for the latter, nor the power of granting the former the power, of conferring the latter ; much less, that it implies the power or the obligation on the part of the government to command or insure a sale. Whatever might be the case under governments in which power is either absolute or single, it is wholly otherwise undei- our system of confederated sovereignties. Here the power of the general government is emphatically delegated and limited, although it is paramount so far as it has been delegated ; and when we look for this power of the' government in relation to this matter in the constitution, we find--if the power to .regulate commerce with foreign nations ; it *616 being the foreign character of that commerce alone which, confers on Congress any power whatsoever with respect to it. It has been urged, that the importer pays a duty to the government for permission to introduce and vend his merchandise ; that it would be unjust, therefore, to deprive him of the power of vending, as he never would have imported except with the expectation of selling. To this it may, in the first place, be replied, as has been remarked in the argument at the bar, that the question here is one of constitutional power ; and if the federal government shall have transcended its legitimate powers, I ask, can it be right, in any view, to compensate those who may have suffered by the transgression, by authorizing unlimited reprisals upon the States ? But in truth no such right as the one supposed is purchased by the importer, and no injury in any accurate sense is inflicted on him by denying to him the power demanded. He has doubtless in view the profits .resulting from the sale of his commodities ; but he has not purchased and cannot purchase from, the government that which it could not insure to him, a sale independently of the laws and polity of the States. He has, under the. legitimate power of the federal government to regulate foreign commerce, .purchased the right to import, or introduce his merchandise, —the right to come in with it in quest of a market, and nothing beyond this. The habits, the tastes, the necessities, the health, the morals, and the safety of society form the. true foundation of his calculations, or of any power or right which may be conceded to him-for the sale of his merchandise, and not any supposed right in the federal government, in contravention of all these, to enforce such sale.
The want of integrity in the argument under examination is farther exposed, by showing that it will not cover the conclusion sought to be drawn from it. If the right of the importer to vend, and his exemption from taxation, are1 made to rest on the payment of duties to the federal government, on what foundation must be. rested his right and his exemption, in reference to articles on which duties are neither paid nor exacted ? Are these to be left exclusively the subjects of State regulation and State taxation ? That they must be so left is a logical and inevitable conclusion from the proposition' that .the right to vend flows from the payment of duties. And then this argument involves the palpable absurdity, that .'merchandise wjbich the government does not so strongly favor as to admit without duty shall remain intact and' sacred-, whilst merchandise which is so much preferred as to be admitted freely — nay,' whose introduction is in effect invited and solicited by the. federal government — may be burdened by the States at pleasure.
It has been insisted, that, as by treaty stipulations articles of foreign merchandise have been admitted for consumption (and much stress is laid upon this expression) in certain specified *617 quantities, consequently by such stipulations, forming the supreme law of the land, the free, sale of these articles must be an absolute right. In what instances a treaty is or is not the supreme law, or is no law at all, I have already endeavoured to distinguish. Passing, therefore, that investigation, it seems very clear that the proposition just adverted to involves a great fallacy. The treaty stipulations here exemplified mean this, and nothing more, namely, that whereas certain enumerated commodities could heretofore be imported only in greater quantities, for the use of those who might choose to buy and consume thém, they may hereafter be imported in lesser quantities. These. stipulations no more signify that commodities shall be circulated and used free of all internal regulation, than they convey a positive mandate for their being purchased and consumed, eaten and drunk, nolens volens, or at all events. Every State that is in any sense sovereign.and independent possesses, and must possess', the inherent power of controlling property held and owned within its jurisdiction, and in virtue and under the protection of its own laws, whether that control be exerted in taxing it, or in determining its tenure, or in directing the manner of its transmission; and this, too, irrespective of the quantities in which it is held or transferred, or the sources whence it may haye been .derived. Such a power differs entirely from an authority essentially extraneous in its character, — an authority limited and specific, by the very terms which confer it; restricted to action upon the progress of property on its way to complete investment under the laws of the State)
The license laws of Massachusetts, Rhode Island, and New Hampshire, now under review, impose no exaction on foreign commerce. They are laws simply determining the mode in which a particular commodity may be circulated within the respective jurisdictions of those States, vesting in their domestic tribunals a discretion in selecting the agents for such circulation, without discriminating between the sources whence commodities may have been derived. They do not restrict importation to any extent; they do not interfere with it, either in appearance or reality ; they do not prohibit sales, either by wholesale or retail ; they assert only the power of regulating the latter, but this entirely within the sphere of their peculiar authority.
These laws are, therefore, in violation neither of the constitution of the United States, nor of any law nor treaty made in pursuance or under the authority of the constitution. Viewing them in this character, my cooperation is given in maintaining them, whatever differences of opinion may exist in relation to their policy or necessity. But since, whilst extending to these laws their sanction and support, there have been advanced by others principles and opinions which to me appear to have their source not in the fountain of all legitimate power in this or any other department of the federal government, I cannot by silence seem to assent to those principles *618 and opinions, nor put from me the Obligation of declaring my dissent from them.
Mr. Justice NELSON concurred in the opinions delivered by the Chief Justice and Mr. Justice Catron.

 See 12 Wheaton, 449, the opinion of Thompson, Justice.